# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: ADC Telecommunications, Inc. ERISA Litigation, <br><br> Relates To All Actions | : <br> : <br> : <br> : Master File No. 03-2989 ADM/FLN <br> : <br> : <br> : |

## AMENDED CONSOLIDATED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA

Plaintiffs Lorraine Osborne, Marjorie Malinski, James A. Carnahan, and Robert T. Crew ("Plaintiffs"), participants in the ADC Telecommunications, Inc. Retirement Savings Plan (the "Plan"), on behalf of themselves and a class of all others similarly situated, allege as follows:

## INTRODUCTION

1.    This is a breach of fiduciary duty class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Plan fiduciaries, including ADC Telecommunications, Inc. ("ADC" or the "Company").

2.    Plans established pursuant to section 401(k) of the Internal Revenue Code ("401(k) plans") confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his retirement investment portfolio. ADC common stock is one of the investment alternatives in the Plan.

3.    Plaintiffs were employees of ADC and participants in the Plan. Plaintiffs' retirement investment portfolio included ADC stock.

4.    Plaintiffs allege that defendants, as fiduciaries of the Plan, breached their duties to

-1-

them and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of ADC stock.

5.     Defendants are liable under ERISA to restore losses sustained by the Plan participants as a result of defendants' breaches of their fiduciary obligations.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

**7.**     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some defendants reside or maintain their primary place of business in this district.

## PARTIES

### Plaintiffs

8.     Plaintiffs worked for ADC and were participants in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7) during the Class Period, and held ADC shares in their retirement investment portfolios.

### Defendants

### ADC Telecommunications, Inc.

9.     Defendant ADC is incorporated in the state of Minnesota, and maintains its primary corporate headquarters at 13625 Technology Drive, Eden Prairie, Minnesota.   ADC is a supplier of broadband network equipment, software and systems integration services that enable communications service providers to deliver high-speed internet, data, video and voice services

to consumers and businesses worldwide.  ADC's customers include local and long-distance telephone companies, cable television operators, wireless service providers, system integrators, and communications equipment manufacturers and distributors.

10.     ADC is the Plan's Sponsor, as well as the Plan administrator.  *See* ADC Retirement Savings Plan Trust Agreement – 1999 Restatement (the "Plan Document"), §§1.1.25, 12.6, ADC-ER 000018, 000079.[1]  ADC, in its role as "Plan Administrator" is a "named fiduciary" of the Plan within the meaning of ERISA.  Plan Document §12.7.  The Company exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  ADC at all times acted through its directors, officers, and employees, including the Chief Executive Officer ("CEO") and members of the Company's Retirement Savings Plan Committee, who were appointed by the Company to perform Plan-related fiduciary functions, and did so in the course and scope of their employment.  ADC had, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities.  Through its Board of Directors, or otherwise, ADC had the authority and discretion to hire and terminate said officers and employees.  ADC also had the authority and discretion to appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plan.  Additionally, by failing to properly discharge their fiduciary duties under ERISA, the director, officer, and employee fiduciaries breached duties they owed to Plan participants and their beneficiaries.  Accordingly, the actions of the Plan's director, officer, and other employee fiduciaries are imputed to ADC under the doctrine of *respondeat superior*, and ADC is liable for their actions.

---

[1]     The Plan Document is attached hereto as Exhibit A.

**Board of Directors ("Director Defendants")**

11.     The Board of Directors, acting as a group, has ultimate fiduciary oversight responsibility for the Plan.  The Board is entrusted with the exclusive authority, which may not be delegated, to act for the Principal Sponsor of the Plan (i.e. ADC) to, among other responsibilities, appoint or remove a Trustee or accept the resignation of a Trustee, appoint or remove members of the Retirement Committee, and appoint or remove any Investment Manager.  *See* Plan Document §12.1.3, ADC-ER 000076.  As such, the Board of Directors is a fiduciary of the Plan within the meaning of ERISA in that it exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

12.     Defendant William Cadogan ("Cadogan") served as President and CEO of ADC from 1991 until February 15, 2001, and Chairman of the Board from 1994 until 2001.  During his tenure with ADC, Cadogan assumed a variety of Plan fiduciary roles and duties.  For example,  Cadogan signed the "Certificate of President and Chief Executive Officer of ADC Telecommunications, Inc." certifying the following:

> I, William J. Cadogan, President and Chief Executive Officer of ADC Telecommunications, Inc., a Minnesota corporation (the "Company") hereby acknowledge that on or about February 14, 2000, I was apprised by the Retirement Committee of the Company of its actions as of such date, as set forth in and amended by Amendment No. 1 to the ADC Telecommunications, Inc. Retirement Savings Plan Trust Agreement attached hereto as Exhibit A, and that I fully concur with such actions as of such time and through this date.

Plan Document, ADC-ER 000121.  Under the master Plan document, the CEO has the authority to delegate and allocate the functions assigned to the Principal Sponsor of the Plan (i.e. ADC) as he deems advisable.  *See* Plan Document, ADC-ER 000076.  Thus, Cadogan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to

-4-

management and administration of the Plan and/or management and disposition of the Plan's as-
sets.  Between February 29, 2000 and March 6, 2000, Cadogan sold 674,612 shares of ADC
stock, reaping proceeds of $32,033,788.  On May 18, 2000, Cadogan announced his intention to
leave the Company.

13.     Defendant Richard R. Roscitt ("Roscitt") has served as the Company's President,
CEO, and Chairman of the Board of ADC since February 2001.  During the Class Period, Roscitt
signed several S-8 submissions to the Securities and Exchange Commission ("SEC") registering
ADC Company stock for the Plan, two of which preceded the Company's March 28, 2001 dis-
closure that the Company needed to implement massive layoffs and aggressive cost-cutting
measures in response to the dramatic downturn in the telecommunications market and the Com-
pany's declining revenues.  Like defendant Cadogan, Roscitt wore a variety of Plan Fiduciary
hats during the Class Period.  For example, Roscitt signed his written concurrence as CEO of the
"Fifth Amendment of ADC Retirement Savings Plan Trust Agreement," certifying that:  "I, Rich-
ard R. Roscitt, do hereby certify that I am the Chief Executive Officer of ADC Telecommunica-
tions, Inc. and I hereby concur in the adoption of the said Amendment."  Plan Document, ADC-
ER 000172.  Thus, Roscitt was a fiduciary of the Plan within the meaning of ERISA in that he
exercised discretionary authority with respect to management and administration of the Plan
and/or management and disposition of the Plan's assets.

14.     Defendant John P. Blanchard III ("Blanchard") has served as a director of ADC
throughout the Class Period.  During the Class Period, Blanchard signed several S-8 submissions
to the SEC providing ADC Company stock to the Plan, two of which preceded the Company's
March 28, 2001 disclosure that the Company needed to implement massive layoffs and aggres-

sive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the Company's declining revenues.  Blanchard was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

15.     Defendant John J. Boyle III ("Boyle") has served as a director of ADC throughout the Class Period.  During the Class Period, Boyle signed several S-8 submissions to the SEC providing ADC Company stock to the Plan, two of which preceded the Company's March 28, 2001 disclosure that the Company needed to implement massive layoffs and aggressive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the Company's declining revenues.  Boyle was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  Between February 24, 2000 and June 14, 2000, Boyle sold 221,492 shares of ADC stock, reaping proceeds of $10,459,557.

16.     Defendant James C. Castle ("Castle") has served as a director of ADC throughout the Class Period.  During the Class Period, Castle signed several S-8 submissions to the SEC providing ADC Company stock to the Plan, two of which preceded the Company's March 28, 2001 disclosure that the Company needed to implement massive layoffs and aggressive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the Company's declining revenues.  Castle was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

17.     Defendant B. Kristine Johnson ("Johnson") has served as a director of ADC

throughout the Class Period.  During the Class Period, Johnson signed several S-8 submissions to the SEC providing ADC Company stock to the Plan, two of which preceded the Company's March 28, 2001 disclosure that the Company needed to implement massive layoffs and aggressive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the Company's declining revenues.  Johnson was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  On March 9, 2000, Johnson sold 8,000 shares of ADC stock, reaping proceeds of $412,720.

18.     Defendant Jean-Pierre Rosso ("Rosso") has served as a director of ADC throughout the Class Period.  During the Class Period, Rosso signed several S-8 submissions to the SEC providing ADC Company stock to the Plan, two of which preceded the Company's March 28, 2001 disclosure that the Company needed to implement massive layoffs and aggressive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the Company's declining revenues.  Rosso was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  On July 17, 2000, Rosso sold 20,000 shares of ADC stock, reaping proceeds of $818,600.

19.     Defendant John D. Wunsch ("Wunsch") has served as a director of ADC throughout the Class Period.  During the Class Period, Wunsch signed several S-8 submissions to the SEC providing ADC Company stock to the Plan, two of which preceded the Company's March 28, 2001 disclosure that the Company needed to implement massive layoffs and aggressive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the

Company's declining revenues. Wunsch was a fiduciary of the Plan within the meaning of ER-ISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20. Defendant Charles D. Yost ("Yost") has served as a director of ADC throughout the Class Period. During the Class Period, Yost signed several S-8 submissions to the SEC providing ADC Company stock to the Plan, two of which preceded the Company's March 28, 2001 disclosure that the Company needed to implement massive layoffs and aggressive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the Company's declining revenues. Yost was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21. Defendant Robert Annunziata ("Annunziata") served as a director of ADC during the Class Period. Annunziata was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22. Defendant Larry W. Wangberg ("Wangberg") served as a director of ADC during the Class Period. Wangberg was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**Retirement Committee**

23. Defendant ADC Telecommunications Retirement Savings Plan Committee (the "Retirement Committee") is designated in the Plan Document as authorized to perform acts "rea-

sonably necessary for administering the Plan." Plan Document §12.2.3(g), ADC-ER 000077. The Retirement Committee consists of "such members as may be determined and appointed from time to time by the [Company] and they shall serve at the pleasure of [the Company]." Plan Document §12.2.1, ADC-ER 000076. The Retirement Committee is a named fiduciary of the Plan. Plan Document §12.7, ADC-ER 000079. As such, the Retirement Committee is a fiduciary of the Plan within the meaning of ERISA in that it exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24.     Defendant Robert E. Switz ("Switz") served as the Company's Senior Vice President, Chief Financial Officer ("CFO"), and as a member of the Retirement Committee during the Class Period. During the Class Period, Switz signed the Company's Forms 11-K, filed with the SEC for the fiscal years ended December 31, 2001 & 2002 (the "2001 Form 11-K" & "2002 Form 11-K") on behalf of the Plan. Moreover, Switz also signed several S-8 submissions to the SEC providing ADC Company stock to the Plan, two of which preceded the Company's March 28, 2001 disclosure that the Company needed to implement massive layoffs and aggressive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the Company's declining revenues. Switz was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

25.     Defendant Charles T. Roehrick ("Roehrick") served as the Company's Vice President and Controller, and as a member of the Retirement Committee, throughout the Class Period. During the Class Period, Roehrick signed the Company's Forms 11-K, filed with the SEC for

the year ended December 31, 1999 and 2000 (the "1999 Form 11-K" and "2000 Form 11-K") on behalf of the Plan.[2] ADC-ER, 000589, 000599. Moreover, Roehrick also signed several S-8 submissions to the SEC providing ADC Company stock to the Plan, two of which preceded the Company's March 28, 2001 disclosure that the Company needed to implement massive layoffs and aggressive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the Company's declining revenues. Roehrick was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. On March 23, 2000, Roehrick sold 8,750 shares of ADC stock, reaping proceeds of $498,050.

26.     Defendant Laura Owen ("Owen") served as Vice President, Human Resources of ADC, and as a member of the Retirement Committee, during the Class Period. Owen signed the Company's 2001 Form S-8 SEC submission registering ADC shares for the Plan on behalf of the Plan. ADC-ER 000487. Owen signed the acceptance and approval of the "ADC Telecommunications, Inc. ADC Telecommunications, Inc. Retirement Savings Plan Administrative Services Agreement," dated April 1, 1999 (the "Administrative Services Agreement") on behalf of the Company.[3] ADC-ER 001668. Pursuant to the Administrative Services Agreement, Owen was delegated the authority to direct American Express Trust, the Plan's Trustee, with respect to the Plan and Trust. Owen was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

---

[2]     The 1999 and 2000 Form 11-K's are attached hereto as Exhibits B and C, respectively.

[3]     The Administrative Services Agreement is attached hereto as Exhibit D.

27.     Defendant Gokul Hemmady ("Hemmady") served as Vice President and Treasurer of the Company, and as a member of the Retirement Committee, during the Class Period.  Pursuant to the Administrative Services Agreement, Hemmady was delegated the authority to direct American Express Trust, the Plan's Trustee, with respect to the Plan and Trust. *See* Administrative Services Agreement, Exhibit A, ADC-ER 001669. Hemmady also was empowered to execute the Second Amendment to the Administrative Services Agreement on May 18, 2001. ADC-ER 001705. Hemmady was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

28.     Defendant Jeffrey D. Pflaum ("Pflaum") served as Vice President, Chief Legal Officer and Secretary of the Company, and was also a member of the Retirement Committee, during the Class Period.  Pflaum signed numerous documents on behalf of the Retirement Committee, including the Certification for Amendment No. 1 to the ADC Retirement Savings Plan Trust Agreement, and other amendments to the Plan Document and Administrative Services Agreement. *See, e.g.*, ADC-ER 001708, 001709.  Pflaum was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**Individual Defendants-Fiduciaries**

29.     Defendant Patricia A. Gilroy ("Gilroy") was an ADC Benefits Consultant during the Class Period, and signed several of the Company's Forms 5500, filed with the United States Department of Labor ("DOL"), on behalf of the Company as "Plan Administrator."  Pursuant to the Administrative Services Agreement, Gilroy was delegated the authority to direct American

Express Trust, the Plan's Trustee, with respect to the Plan and Trust. *See* Administrative Services Agreement, ADC-ER 001669. Gilroy was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

30.     Defendant Debra L. Raths ("Raths") served as the Benefits Director of ADC and signed the acceptance and approval of the Administrative Services Agreement on behalf of the Company. She also was empowered to execute the First Amendment to the Administrative Services Agreement on February 23, 2000. ADC-ER 001704. Pursuant to the Administrative Services Agreement, Raths was delegated the authority to direct American Express Trust, the Plan's Trustee, with respect to the Plan and Trust. *See* Administrative Services Agreement, ADC-ER 001669. Raths was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

31.     Defendants include named and de facto fiduciaries with respect to the Plan. All defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

32.     Unknown Fiduciary Defendants 1-100 are residents of the United States and are or were fiduciaries of the Plan during the Class Period. Their identities are currently unknown to plaintiffs; once their identities are ascertained, plaintiffs will seek leave to join them under their true names.

## **THE PLAN**

33.     The ADC Telecommunications, Inc. Retirement Savings Plan is a defined contri-

bution  "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. §

1002(2)(A).  The Company touts its Plan as a "powerful savings tool" for its employees, through

which ADC "partners" with its employees to "build" their retirement funds.  *See* ADC Benefits

Summary, 2003, United States ("2003 SPD"), ADC-ER 000227.[4]  The relief requested in this

action is for the benefit of the Plan and its participants/beneficiaries.

34.     The Plan is available to all regular or extended temporary full-time or part-time

employees of ADC.  *See* 2003 SPD, ADC-ER 000227.

35.     As noted above, ADC is the Principal Sponsor and Administrator of the Plan.  *See*

Plan Document  §§1.1.25, 12.6, ADC-ER 000018, 000079.  The Company's administrative pow-

ers, duties and responsibilities have been in turn delegated among ADC's CEO, Board of Direc-

tors, Retirement Committee, and specifically designated administrative fiduciaries.

36.     According to the 2003 SPD, the Plan itself is directly administered by the Retire-

ment Committee, whose members are appointed and monitored by ADC's Board of Directors.

*See* 2003 SPD, ADC-ER 000243.  The Retirement Committee has full discretionary power and

authority to administer and interpret the Plan and to determine all factual and legal questions un-

der the Plan.  *See id*.

37.     According to the Company's 2002 Form 11-K, the American Express Trustee

Company ("American Express") is the Trustee and record-keeper and "is responsible for holding

investment assets of the Plan, executing investment transactions, and making disbursements to

participants."

---

[4]     The 2003 SPD is attached hereto as Exhibit E.

38.     Plan participants[5] are permitted each pay period to contribute from 1% to 25% of

their compensation into the Plan.[6]  "To help [participants'] savings grow, "ADC matches 100%

of employee contributions up to 6% of a participants' total compensation.[7]  1999 SPD,[8] ADC-ER

000196.[9]  The Company may also make "performance match contributions." 2002 Form 11-K.[10]

39.     The 2002 Form 11-K further indicates that participants may direct their contribu-

tions into one of a number of mutual fund, fixed income and equity investment vehicles.  Among

these investment alternatives, participants can choose to direct contributions into ADC common

stock.

40.     In the years before ADC's stock price began to plunge, Company common stock

holdings represented the largest single investment of the Plan.  According to the Company's

2002 Form 11-K, as of December 31, 2002, the Plan's holdings in ADC common stock consti-

tuted $40,558,916, or 19% of the total investments held by the Plan.  However, this percentage

---

[5]     There were 11,068 participants in or beneficiaries of the Plan as of December 31, 2000.  Plan Summary
Annual Report - 2000, ADC-ER 000442.  The Plan had 8,682 participants or beneficiaries as of December 31, 2001,
Plan Summary Report - 2001, ADC-ER 000441, and 6,490 as of December 31, 2002, Plan Summary Report - 2002,
ADC-ER 000443.  The steady decline of Plan participants, upon information and belief, tracked Company layoffs
and position terminations.

[6]     Prior to July 1, 2002, participants could only contribute between 1% and 15% of their compensation
into the Plan.

[7]     Effective April 1, 2003, the Company match was amended to be 50% of a participant's contributions up
to the first 6% of a participants compensation.  2002 Form 11-K.

[8]     The 1999 SPD is attached hereto as Exhibit F.

[9]     According to the 1999 SPD, "[f]rom 1990 through 1997, ADC contributed an amount equal to 1% of
pay to eligible employee's accounts.  These contributions were automatically invested in the ADC Stock Fund."
1999 SPD, ADC-ER 000199.

[10]     "Performance match contributions are based on ADC's fiscal financial results. [A participant] may re-
ceive from $0 to $0.70 for every dollar" contributed by participants.  ADC 401(k) Plan Highlights, ADC-ER 000179.
The decision whether to provide a performance company match to Plan participants is made yearly by the Board of

has steadily decreased over the past few years as the value of ADC common stock has plum-

meted with the publication of defendants' improper activities.  More specifically, as of December

31, 2001, 29% of the Plan's total investments was comprised of ADC common stock.  This per-

centage was even higher, **58%**, as of December 31, 2000, when ADC common stock was trading

at nearly five times its December 2002 levels.  During calendar 2001, the Plan's holdings in

Company stock depreciated in value by approximately **$213 million**, decreasing almost another

**$50 million** in calendar 2002.  Plan Financial Statements and Schedules - Ernst & Young, ADC-

ER 000476.

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2)

and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following

class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time be-
> tween February 24, 2000 and the present (the "Class Period") and whose accounts
> included investments in ADC stock.

42.     The members of the Class are so numerous that joinder of all members is imprac-

ticable.  While the exact number of Class members is unknown to plaintiffs at this time, and can

only be ascertained through appropriate discovery, plaintiffs believe there are, at a minimum,

thousands of members of the Class who participated in, or were beneficiaries of, the Plan during

the Class Period.

43.     Common questions of law and fact exist as to all members of the Class and pre-

dominate over any questions affecting solely individual members of the Class.  Among the ques-

---

Directors.  2003 SPD, ADC-ER 000196.

tions of law and fact common to the Class are:

      (a)     whether defendants each owed a fiduciary duty to plaintiffs

            and members of the Class;

      (b)     whether defendants breached their fiduciary duties to plaintiffs and mem-

            bers of the Class by failing to act prudently and solely in the interests of

            the Plan's participants and beneficiaries;

      (c)     whether defendants violated ERISA; and

      (d)     whether the members of the Class have sustained damages and, if so, what

            is the proper measure of damages.

44.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

45.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

46.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

47.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of es-

tablishing incompatible standards of conduct for defendants; (ii) defendants have acted or re-

fused to act on grounds generally applicable to the Class, thereby making appropriate final in-

junctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole;

and (iii) questions of law or fact common to members of the Class predominate over any ques-

tions affecting only individual members and a class action is superior to the other available

methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' FIDUCIARY STATUS

48.     During the Class Period, defendants had discretionary authority with respect to

the management of the Plan and/or the management or disposition of the Plan's assets.

49.     During the Class Period, all of the defendants acted as fiduciaries of the Plan pur-

suant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**ADC Telecommunications, Inc.**

50.     ERISA requires every plan to provide for one or more named fiduciaries who will

have "authority to control and manage the operation and administration of the plan." § 402(a)(1),

29 U.S.C. § 1102(a)(1).  The Company is a "named fiduciary" of the Plan "for the purpose of sec-

tion 402(a) of ERISA."  Plan Document §12.7, ADC-ER 000079.

51.     The Company is designated as the Plan administrator for purposes of section

3(16)(A) of ERISA.  *See* Plan Document §12.7, ADC-ER 000079.  Therefore, the Company has

full discretionary authority to manage and control the operation and administration of the Plan.

52.     Instead of delegating all fiduciary responsibility for the Plan to external service

providers, ADC chose to internalize this fiduciary function.

53.     As described in further detail below, the Company's administrative duties are

-17-

delegated among ADC's CEO, Board of Directors, the Retirement Committee, and individual administrative fiduciary delegates. *See* Plan Document § 12.1.1, ADC-ER 000076 ("[F]unctions generally assigned to [ADC] shall be discharged by its officers or delegated and allocated as provided herein.").

**Director Defendants and Chief Executive Officer**

54.     The Board of Directors and CEO are named fiduciaries of the Plan for the purposes of section 402(a) of ERISA.  Plan Document § 12.7, ADC-ER 000079.

55.     ADC's CEO has the broad power to "delegate or redelegate and allocate and reallocate to one or more persons or to a committee of persons jointly or severally, and whether or not such persons are directors, officers or employees, **such functions assigned to the [Company] as the Chief Executive Officer may from time to time deem advisable**."  Plan Document,  §12.1.2, ADC-ER 000076 (emphasis added).

56.     The Company's Board of Directors has extensive oversight authority over the Plan, including the power to terminate the Plan, appoint or remove members of the Retirement Committee, and to determine the amount of Company contributions to the Plan.  Specifically, the Company's Board of Directors has the exclusive authority to act for the Company in the following respects:

      (a)      to terminate the Plan,

      (b)      to appoint or remove a Trustee or accept the resignation of a Trustee; to appoint or remove members of the [Retirement] Committee; to appoint or remove an Investment Manager,

      (c)      to determine the Employer contributions [to the Plan]; to re-

duce suspend or discontinue contributions to the Plan,

(d)      to cause the Plan to be merged with another plan and to trans-

fer assets and liabilities between the Plan and another.

Plan Document,  §12.1.3, ADC-ER 000076; *see also*, 2003 SPD, ADC-ER 000243.

57.     Further, the Company "reserves the power to amend [the Plan] and either prospec-

tively or retrospectively or both:

(a)      in any respect by resolution of its Board of Directors; and

(b)      in any respect that does not materially increase the cost of the plan by ac-

tion of the [Retirement] Committee (with the written concurrence of the

Chief Executive Officer . . . .).

Plan Document § 9.1, ADC-ER 000060.

**Retirement Committee**

58.     The Retirement Committee is a named fiduciary of the Plan for the purposes of

section 402(a) of ERISA.  Plan Document § 12.7, ADC-ER 000079.  It and its individual mem-

bers are responsible for performing all acts reasonably necessary for administering the Plan and

carrying out the provisions of the Plan Document and performing the duties imposed on it.  *See*

Plan Document § 12.2.3(g).   Further:

> The Committee shall make such determinations as may be required
> from time to time in the administration of the Plan. The Committee
> shall have the sole authority and responsibility to interpret and con-
> strue the Plan [Document] and to determine all factual and legal
> questions under the Plan . . . .

Plan Document § 11.1, ADC-ER 000073.

59.     The Retirement Committee's general and specific powers and responsibilities

with respect to the investment of Plan assets are broad.

60.     Generally, "[t]he Committee shall determine the general investment characteristics and objectives for each [investment alternative]" offered under the Plan.  Plan Document § 4.1.1, ADC-ER 000035.

61.     Further, "[t]he Committee shall have the power, from time to time, to dissolve [individual Plan investment alternatives], to direct that additional [investment alternatives] be established and, under rules, to withdraw or limit participation in a particular [investment] fund." Plan Document § 4.1.3, ADC-ER 000035.

62.     The Plan Document specifically mandates prudence and care on the part of the Retirement Committee when the portfolio of investment alternatives is chosen for the Plan:

> Such investment subfunds shall permit Participants and Beneficiaries the opportunity to choose from at least three investment alternatives, each of which is diversified, each of which presents materially different risk and return characteristics, and which, in the aggregate, enable Participants and Beneficiaries to achieve a portfolio with appropriate risk and return characteristics consistent with minimizing risk through diversification.

Plan Document § 4.1.4, ADC-ER 000035.

63.     In order to "assist the [Retirement Committee] in effectively supervising, monitoring, and evaluating the investment program established for [the Plan]" and "ensure compliance with all ERISA fiduciary requirements," the Retirement Committee has established, and periodically updated/amended, a formal Investment Policy Statement for the Plan.  *See* Investment Policy Statement For ADC Telecommunications Inc. Retirement Savings Plan Restated Effective September 4, 2002 ("Investment Policy Statement"), ADC-ER 000622.[11]

---

[11]     The Investment Policy Statement is attached hereto as Exhibit G.

64.     Among the Retirement Committee's duties is to "establish the number and types of investment alternatives available to Plan participants," and "select investment alternatives and conduct proper due diligence in the selection of the investment managers retained to manage the investment alternatives."  Investment Policy Statement, ADC-ER 000623.  Thus, the Investment Policy Statement clearly delineates the Retirement Committee's discretion in deciding how the Plan's investments are diversified in alternate investment vehicles, including whether to invest Plan assets in ADC stock, and to what percentage.

65.     The Retirement Committee is also required to "[m]onitor and evaluate the performance results achieved by the investment managers (no less frequently than annually) according to the guidelines provided [in the Investment Policy Statement]."  Investment Policy Statement, ADC-ER 000623.  These guidelines include the criterium that the investment "meet or exceed" certain "Performance Numbers" as defined by:

- Long-term focus;

- **Above median results relative to peer group and above market benchmark over cumulative three  and five year periods and rolling three-year periods**;

- Net of free basis.

Investment Policy Statement, ADC-ER 000625 (emphasis added).

66.     In monitoring the Plan's investments, the Retirement Committee is bound by certain "Review Standards":

> **The Committee acknowledges that, from time to time, there may be a need to replace an existing investment alternative** and/or manager.  Factors that may lead to termination decision, include but are not limited to:

1. Extraordinary Events

- Organizational changes

- Key investment professionals leave the firm

- Investment manager changes the strategy it was hired to implement

- Investment manager is involved in material litigation or fraud

- Material client-servicing problems

2. Long-Term "Market Index" Objective

- Investment manager fails to outperform the identified market index over the majority of cumulative and rolling three-year periods observed.

3. Long-Term "Peer Group" Objective

- Investment manager fails to outperform the median return of the identified peer group over the majority of cumulative and rolling three-year periods observed.

Investment Policy Statement, ADC-ER 000625 (emphasis added).

67.     In addition to the Retirement Committee's duty to monitor Plan investments, it is

also **required** to communicate with Plan participants as follows:

> **Communications with Plan participants should occur at least quarterly in regard to the performance of Plan investments. These communications shall be in writing or other appropriate means. Communications should occur with the purpose of providing participants with information that assists them in having control over their investments. Special meetings or communications may occur if significant concerns arise about investment strategy or performance or if other significant conditions arise that warrant such communications.**

Investment Policy Statement, ADC-ER 000623 (emphasis added).

68.     Contrary to its duties to monitor Plan investments and communicate with Plan

participants regarding Plan investments, the Retirement Committee participated in the obfusca-

tion and misrepresentations perpetrated by defendants, as described below, in order to materially

inflate the value of the Company's stock while insider defendants sold more than 932,000 shares

of ADC stock, reaping proceeds of more than $44 million, a clear breach of fiduciary duty.

**Individual Defendants – Fiduciaries**

69.     The Plan Document envisions the delegation of fiduciary tasks to individual Offi-

cers and/or other high-level employees. *See, e.g.*, Plan Document § 11.3.1 ("Information to be

supplied or written notices to be made or consents to be given by [ADC] . . . or the Committee . .

. may be signed in the name of any [Company] officer who has been authorized to make such

certifications or give such notices or consents or by any Committee member.").

70.     Generally, the Committee is empowered to "delegate or redelegate to one more

persons, jointly or severally, and whether or not such persons are members of the Committee or

employees of [ADC], such functions assigned to the Committee [under the Plan Document] as it

may time to time  [sic] deem advisable."  Plan Document § 12.2.3(i), ADC-ER 000078.  Defen-

dants Gilroy and Raths were such Plan fiduciary delegates during the Class Period.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

71.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under

§ 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary

functions.  Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a

fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control re-

specting management of such plan or exercises any authority or control respecting management

or disposition of its assets . . . ."  During the Class Period, defendants performed fiduciary func-

tions under this standard, and thereby also acted as fiduciaries under ERISA.

72.     Furthermore, the Plan Document codified what is often a practical truth: "Individuals, firms, corporations or partnerships identified herein or delegated or allocated authority or responsibility hereunder may serve in more than one fiduciary capacity."  Plan Document, §12.5, ADC-ER 000079.

73.     During the Class Period, ADC's direct and indirect communications with Plan participants included material misrepresentations and omissions which caused plaintiffs and members of the Class to purchase, and to hold and maintain, investments in Company stock, and to accept at face value investments in Company stock.  These communications included, but were not limited to SEC filings, annual reports, and press releases.[12]  ADC also acted as a fiduciary to the extent of this activity.

74.     Lastly, the Plan Document enshrines the overarching duties and responsibilities of all Plan fiduciaries under ERISA:

> [f]iduciar[ies] . . . in the exercise of each and every power or discretion vested in them by the provisions of this Plan [Document], shall (subject to the provisions of ERISA) discharge their duties with respect to the Plan solely in the interest of the Participants and Beneficiaries and:
>
> (a)     for the exclusive purpose of:
>     (i)     providing benefits to Participants and Beneficiaries, and
>     (ii)    defraying reasonable expenses of administering the Plan,
>
> (b)     with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with

---

[12]     Company press releases were often transmitted to ADC employees, including Plan participants, via Company e-mail.

            like aims,

(c)      in accordance with the documents and instruments governing the Plan, insofar as they are consistent with the provisions of ERISA.

**Notwithstanding anything in this Plan [Document] to the contrary, any provision hereof which purports to relieve a fiduciary from responsibility or liability from any responsibility, obligation or duty [under ERISA] shall, to the extent the same is inconsistent with [ERISA], be deemed void.**

Plan Document § 10.11, ADC-ER 000070-000071 (emphasis added).

## DEFENDANTS' CONDUCT[13]

**A.**     **ADC Stock Was an Imprudent Investment for the Plan**

     **1.**     **Background**

     75.     According to the Company's Form 10-K, filed with the SEC on January 10, 2003, throughout the Class Period, ADC was a global supplier of broadband network equipment and software and systems integration services that enabled communications service providers to deliver high-speed Internet, data, video and voice services to consumers and businesses worldwide. ADC's products and development efforts focused on increasing the speed and efficiency of the "last mile" portion of communications networks - that is, the network equipment that connects service providers to end users' homes and businesses, as well as wireless communications devices. ADC's products and services included: (1) Broadband Connectivity; (2) Broadband Access and Transport; and (3) Integrated Solutions.

     76.     By the inception of the Class Period, demand for broadband products and services generally, and for ADC's products specifically, had evidenced a sudden and dramatic decline.

---

13     This is a breach of fiduciary duty action. Fraud is not a claim, and to the extent that any allegation within

On January 21, 2000, for example, the *Associated Press* reported that "Communications equipment maker Lucent Technologies saw quarterly profits plunge 23 percent for 1999's last three months, narrowly missing Wall Street forecasts that were already slashed after a warning two weeks ago." Lucent typified an industry-wide trend beginning in early 2000.

77.     As the total worldwide debt of telecom companies approached a staggering $700 billion, and as market prices for broadband plummeted due to overbuilding and capacity over-supply, orders at ADC suddenly declined dramatically. As debt service began to absorb a large portion of ADC's available cash, customers of ADC began drastically decreasing the amount of money they spent on additional systems purchases.

78.     Thus, due to this collapse of the telecommunications "bubble" since the start of the Class Period, ADC was experiencing many of the same business problems that were facing the entire telecommunications industry, relating to oversupply, spending concerns, and weakening customer demand. As such, if it was **ever** appropriate to invest as much as **58%** of ADC employees' retirement savings exclusively in un-hedged shares of ADC stock, by the inception of the Class Period this was no longer the case.[14] At no time during the Class Period was ADC stock a suitable investment for the Company's employees or for retirement investments that required diversification.

79.     In early 2000, at the same time that other companies throughout the telecommunications industry were reporting weak year-end 1999 earnings and issuing weaker forecasts for 2000, ADC was disseminating optimistic predictions about the Company's future to Plan partici-

---

this complaint sounds in fraud, it is hereby disavowed to the extent that it sounds in fraud.

[14]     As noted above, according to the Company's 2002 Form 11-K, as much as 58% of the Plan's investments were comprised of ADC common stock.

pants.  Defendants also continued to funnel retirement money into ADC stock, which, on February 15, 2000, closed above $79 per share before splitting, two-for-one, on February 16, 2000.

80.     While Plan participants were continuing to invest their retirement income in ADC stock, several defendants and Plan fiduciaries were selling their own personal holdings of Company shares.  Between February 24, 2000 and July 17, 2000, these defendants sold more than 932,000 shares of ADC stock, reaping proceeds of more than $44 million.

81.     Ultimately, in late March 2001, defendants admitted what they could no longer deny – that ADC, like most telecommunications companies, was suffering.  On March 28, 2001, defendants revealed that the Company needed to implement massive layoffs and aggressive cost-cutting measures in response to the dramatic downturn in the telecommunications market and the Company's declining revenues.  From a high above $26 per share on December 11, 2000, ADC's stock price plunged to $8.21 per share that day.  The stock's price has never really recovered, trading below $3 per share for most of 2003.

82.     Rather than taking the prudent step of divesting the Plan of its holdings in Company stock during the Class Period, defendants took the opposite route and continued to steer Plan participants towards investing in ADC stock.  In fact, as described herein, throughout the Class Period, defendants:  (i) ignored ADC's own internally generated negative forecasts; (ii) improperly shifted revenues from future quarters into current quarters, in order to meet earnings forecasts; and (iii) disregarded ADC's dramatically rising inventory levels.  At all relevant times, the Individual and Director Defendants concealed that they were actively engaged in massive internal cost-cutting measures and were already planning employee lay-offs.  In addition, throughout the Class Period, defendants also failed to disclose that billions of dollars of pur-

ported assets had been materially impaired and had little or no value.

**2.    Defendants' Mislead Plan Participants With Regard to Its Severe Business Decline**

83.    Despite defendants' knowledge that demand for its products had severely declined during the Class Period due to the collapse of the telecommunications industry as described above, the Company continued to represent that ADC stock was a sound investment for Plan participants.  For example, on November 29, 2000, defendant Cadogan appeared on *Market Coverage*, a financial news program broadcast on CNN's Financial News Network ("CNNfn"), and stated:

> Well, I think it's a very interesting time for telecom equipment companies. ***While the number of casualties continues to grow, I think ADC is in an excellent position.***  I think certainly this last quarter is evidence of that.  What we think is likely to happen: ***we're going to continue to probably oppose the overall market force and continue to deliver strong performance***.  (Emphasis added).

84.    On November 2, 2000, ADC announced in a press release that it expected to meet or exceed the diluted earnings per share ("EPS") consensus estimates (from First Call®), before non-recurring credits and charges, of $0.17 per share for the fiscal fourth quarter of 2000 and $0.46 per share for fiscal 2000.  ADC also confirmed its expectation to achieve the diluted earnings per share consensus estimates, before non-recurring credits and charges, in the range of $0.68 to $0.70 per share for fiscal 2001.  Defendant Cadogan stated:

> Despite recent market concerns, we remain confident that we can achieve our long-term goals for annual sales growth at 25% to 30% with earnings per share growth at the same or higher rate, before non-recurring credits and charges. ADC's strong operating results to date and continued strong growth expectations are a result of our leading market positions, diversified product mix and broad global customer base, supported by our outstanding employees, significant capacity expansions worldwide, critical-mass acquisitions and innovative new

product platforms.

85.     On November 28, 2000, ADC issued a press release announcing sales of $1.03 billion and EPS of $0.18 for the fiscal fourth quarter ending on October 31, 2000.  The Company reiterated its projections for fiscal 2001 from the preceding paragraph, and predicted fiscal 2001 first quarter EPS of approximately $0.12 based on sales of approximately $850 million.  ADC's own long-term goals called for annual sales growth of 25% to 30%.  Defendant Cadogan reiterated his November 2, 2000 statement:

> We remain confident that we can achieve our long-term goals for annual sales growth at 25% to 30%, with pro forma diluted earnings per share growth at the same or higher rate. ADC's strong operating results to date and continued strong growth expectations are the combined result of our leading market positions, diversified product mix, broad global customer base, outstanding employees, significant capacity expansions worldwide, critical-mass acquisitions and innovative new product platforms.

86.     Also on November 28, 2000, during a teleconference with analysts, defendant Cadogan downplayed systemic problems in the telecommunications industry, as reported by *Bloomberg News*.  The article stated, "***Although he knew of phone companies scaling back spending on telecommunications networking equipment, during the conference call . . . Cadogan assured the analysts that 'spending fears were overblown*.'**" Moreover, defendant Cadogan mocked investors for their nervousness, stating, "***Almost every fall, Wall Street seems to sell off ADC shares and most of our peers in an overreaction to telecom spending concerns*.**"  Cadogan also noted that similar worries in 1998 proved to be unfounded, stating, "***Wall Street's concerns were overdone, and the sky did not fall.***" (Emphasis added).

87.     On November 29, 2000, defendant Cadogan appeared on CNNfn, where he commented on the collapsing telecommunications market:

(CNNfn Anchor) ALLAN CHERNOFF: My question, do you see more strong quarters ahead?  The stock market seems to be saying, no?

CADOGAN:  Well, I think it's a very interesting time for telecom equipment companies.  ***While the number of casualties continues to grow, I think ADC is in an excellent position.***  I think certainly this last quarter is evidence of that.  What we think is likely to happen: ***we're going to continue to probably oppose the overall market force and continue to deliver strong performance***.

CHERNOFF: We just showed a graphic saying that the company does see a seasonal slowdown in the first quarter.  Can you elaborate on that, please?

CADOGAN: Yeah, I think what that means, Allan, is, our first quarter traditionally is the slowest of our four quarters.  But when we look at the first quarter for us, we do see revenue growth of something over 40 percent in that first quarter, and earnings growth of something better than 70 percent.  ***So while it's a seasonal slowdown from our strong fourth quarter, on a year-over-year basis we expect nothing less than super results, yet again***.

(Emphasis added).

88.  Defendant Cadogan repeated this theme of optimism about ADC's near-term prospects in spite of industry-wide softening when he appeared the same day on CNBC's *Squawk Box*:

[CNBC Anchor] BOB PISANI: What kind of growth rate do you expect from your company and what kind do you expect out of the industry?

CADOGAN: Well, I think ADC historically over the last couple of years has grown at a multiple of the industry's growth rate.  But for us next year, we are looking at earnings growth in the 36 to 40 percent range.  I think that is going to once again be very close to industry leading numbers and I think it is really, again, focused on the segment that ADC spends most of its attention on, building out broadband networks.  That is really, in our judgement, the sweet spot of the industry, where most of the attention is and where most of the opportunity is.

-30-

DAVID SIMON: William, David Simon.  There is a perception in your industry that there has been a big inventory build up over the last couple of quarters and right now customers are going to start to push out orders.  Do you see any of that or what do you see coming in the future?

CADOGAN: Well, I think, David, certainly there have been scattered reports.  I think recently AT&T's announcement would seem to support that there is strong inventory build ups.  As we look at the fourth quarter and really the start of our new fiscal year, we have not seen any strong evidence of that.  But clearly there are scattered pockets of inventory build ups which really will drag on revenue growth for some of our competitors as we enter the new year.

FABER: So you have no real concern at this point about this overall concern that has been in the market and has certainly been impacting the shares of those who you provide the equipment to?

CADOGAN: Well, certainly it is there.  I don't think there is any way that you can question that there are some of the CLECs that are struggling and some likely that will get consolidated here in the next year.  But I think the real story behind this is there are many more that have reasonably robust business plans which will get funding and will build out broadband networks over the next year.  We are happy that ADC is partnered with a good number of those.

FABER: So, you know, there is a lot of concern in the overall market right now about a softening economy.  It doesn't sound like you are seeing any softening at all?

CADOGAN: No, but we are being vigilant.  You know, I don't want to be Pollyannaish about that.  I mean we are taking this business very seriously.  We are looking at all signs of potential weakness.  But at this point we are very comfortable with our near term outlook.  We are going to be looking at something in the range of better than 40 percent revenue growth in our first quarter and better than 70 percent earnings growth.  But we are constantly on the watch because, as you said, there are some danger signs out there.

89.   Over the next two months, as the telecommunications industry continued to

slump, ADC continued to present an unrealistically optimistic front.  On January 19, 2001, ADC

disseminated a press release that acknowledged some weakness in the sector, but again repre-

sented that ADC would be able to achieve significant growth.  The press release quoted

Cadogan:

> "At this time, ADC sees a significant change in economic and market
> conditions compared to the assumptions in our November 2000 guid-
> ance. Given these current conditions, we believe it is appropriate to be
> more cautious regarding our growth assumptions," said William J.
> Cadogan, chairman and chief executive officer of ADC. "Conse-
> quently, we are revising our annual growth assumptions for sales and
> pro forma diluted earnings per share to approximately 15% from pre-
> vious guidance of 25-30%. Until economic and market conditions im-
> prove, we expect this revised year-over-year growth rate of sales and
> earnings per share for both fiscal year 2001 and the remaining quar-
> ters of 2001. We remain confident that our strategy to provide broad-
> band products and services for the 'last mile/kilometer' of communica-
> tions networks is focused on one of the most rapidly expanding areas
> of the communications industry."

90.     Although in this January 19, 2001 release the Company did not fully disclose the

severity of problems that it was facing, along with the rest of the sector, ADC's revised profit

projections caused the Company's stock to fall 27% that day.  Also on January 19, 2001,

*Bloomberg News* commented on ADC's revised profit forecasts:

> ADC Telecommunications Inc., less than two months after saying it
> would meet profit forecasts, cut in half its 2001 outlook, sending the
> phone-equipment maker's shares down 27 percent....
>
> ADC, which blamed the shortfall on a weakened U.S. economy and
> cuts in spending by its customers, joins more than a dozen other tele-
> communications equipment vendors in lowering earnings forecasts
> for the fourth calendar quarter of 2001.  The S&P Communication
> Equipment Index has fallen 27 percent since October, and ADC
> shares are down 21 percent.
>
>                          * * *
>
> ***Minnetonka, Minnesota-based ADC had offered an optimistic out-***
> ***look for fiscal 2001 during a Nov. 28 conference call, departing***
> ***sharply from other equipment makers that were cutting forecasts****...*

-32-

(Emphasis added).

91.     On February 21, 2001, *Bloomberg News* reported on the effects of the weak econ-
omy on the telecommunications sector, noting that "ADC predicted late last year that it would
avoid the shortfalls reported by many rivals." The article quoted fund manager Michael Cohen
of Analytics Digital Future Fund, who stated that "[w]ithin the last month, telecom spending has
been slowing quite dramatically," and that "ADC 'is really eking out profitability by cutting
costs. You can't grow a business that way forever.'" The article cited ADC's cost-cutting meas-
ures, including "cutting jobs, exiting a product line, and closing and consolidating facilities."

**3.     Defendants Begin to Reveal the Depths of ADC's Financial Troubles**

92.     On March 28, 2001, the Company issued a press release in which defendants fi-
nally began to reveal the seriousness of the problems they were facing along with the rest of the
telecommunications industry. In that release, the Company slashed its financial forecasts and
announced that it would layoff 3,000 to 4,000 of its employees, worldwide. More specifically,
the release stated:

> ADC (Nasdaq: ADC, www.adc.com), a leading global supplier of fi-
> ber optics, network equipment, software and integration services for
> broadband, multiservice networks, today announced that sales and
> pro forma earnings per share are expected to be lower than its guid-
> ance announced on February 21, 2001 for the second fiscal quarter
> ending April 30, 2001 and fiscal year 2001. Pro forma earnings ex-
> clude non-cash stock compensation expenses, non-recurring charges
> and restructuring charges, however, do include certain one-time oper-
> ating charges. ADC also announced plans to eliminate an additional
> 3,000 to 4,000 employees worldwide from its existing workforce by
> the end of its fiscal year ending October 31, 2001.
>
> As a result of an extremely challenging economic environment and a
> further slowdown in capital spending by communications service pro-
> viders in 2001, ADC now expects sales in the second quarter of 2001
> to be approximately $650-700 million (compared to $771 million in
> the second quarter of 2000) and pro forma diluted loss per share to be

$0.10 to $0.15 (compared to pro forma diluted earnings per share of $0.10 in the second quarter of 2000). ADC expects lower operating profit margins in the second quarter primarily as a result of lower sales of broadband connectivity products and increased operating reserves than expected in its February 2001 guidance. ADC plans to increase operating reserves based upon its thorough review of all businesses in recent weeks in response to the more challenging economic environment and the rapid downturn in telecommunications capital spending.

Given the difficulty in forecasting during rapidly changing conditions, ADC will not provide detailed guidance for lower-than-expected sales and pro forma diluted earnings per share for fiscal year 2001 until its second quarter earnings release in the latter half of May 2001. ADC, however, currently expects to have positive pro forma earnings per share in the second half of fiscal year 2001. Sales by business group as a percent of total ADC sales, prior to product line rationalizations, are now expected to be approximately 45-50% for Broadband Connectivity (previous guidance was 50-55%), 25-30% for Broadband Access and Transport (unchanged), and 20-25% for Integrated Solutions (unchanged) for the second quarter and the fiscal year of 2001.

International sales in the second quarter of 2001 are expected to remain strong. International sales are expected to reach 25-30% as a portion of total ADC sales compared to 21% in the second quarter of 2000. However, ADC continues to monitor international sales activity for the possibility of a slowdown as the year progresses.

"The rapid downturn of telecommunications capital spending is clearly having a greater than anticipated impact on ADC's revenue and profits this year," said Richard R. Roscitt, newly appointed chairman and chief executive officer of ADC. "In this environment, we are pleased to be maintaining, and in some cases increasing, market share across many of our product lines worldwide. We are also encouraged by the current strong level of our international sales. Like many of our peers, the slowdown of telecommunications capital spending continues to limit our visibility in 2001. Hence, we are becoming even more conservative in our guidance, much more aggressive in our cost reduction efforts and more focused on profitable products with long-term, strategic growth potential. Over the long term as market conditions strengthen, we remain confident that our strategy to provide fiber optics, network equipment, software and integration services for the 'last mile/kilometer' of broadband communications networks is focused on one of the areas in the communications industry with the greatest worldwide growth potential."

-34-

COST REDUCTION ACTIONS

As in the first quarter of 2001, ADC is continuing to implement aggressive plans to further control expenses in 2001. Additional actions for cost reductions in fiscal year 2001 include:

- Rationalizing nonstrategic product lines through the remainder of the year;

- Reducing further the number of ADC employees by approximately 3,000 to 4,000 people worldwide through planned reductions, attrition and product line rationalizations. These reductions are in addition to the approximately 3,000 employee positions eliminated to date in fiscal year 2001 through reductions in force and attrition;

- Eliminating most outside contract and temporary employees;

- Consolidating facilities; and

- Cutting discretionary expenses company wide.

Many of these planned actions are expected to result in non-recurring and restructuring charges in amounts that have not yet been determined.

93.     On March 28, 2001, the same day that the Company issued the press release quoted in the previous paragraph, shares of ADC stock fell by 22%, to $8.22, a price approximately 83% below the average price at which defendants Cadogan, Boyle, Johnson, Roehrick, and Rosso sold shares of ADC stock.

94.     Throughout the Class Period, the defendants all knew, while they were making rosy predictions about the Company's future, that the global downturn in telecommunications spending was having a severely adverse effect on ADC's revenues and earnings.

**B.     Defendants Knew or Should Have Known that ADC Stock was not a Prudent Plan Investment**

95.     At all relevant times, defendants knew or should have known that ADC would not be able to avoid the industry-wide softening that was plaguing other telecommunications companies, and that ADC's earnings and revenues were unrealistically optimistic, all of which made

ADC stock a highly imprudent Plan investment.

96.     Defendants failed to conduct an appropriate investigation into whether ADC stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding ADC's true financial health, such that other fiduciaries and the Plan participants could make informed decisions regarding ADC stock in the Plan, and otherwise failed to protect the Plan and its participants against losses that were foreseeable as a result of the downturn in the telecommunications business and the failure to properly diversify Plan participants' assets.

**97.**     Defendant Cadogan's failure in this regard is particularly apparent.  As a result of his role as the CEO, Cadogan knew or should have known about the Company's improper practices.  Upon information and belief, despite his complicity (as described below) in the scheme to deceive Plan participants, and his obligation to properly and materially inform Plan participants of the true risks inherent in holding concentrated positions in ADC stock, he remained silent.  In fact, Cadogan not only failed to warn Plan participants about the precarious nature of investing in ADC stock, he also sold nearly 675,000 shares of ADC stock himself, reaping proceeds of more than $32 million.

**1.     Defendants Had Specific Knowledge of the Company's Financial Troubles and Took Material Steps to Concealed the Truth From Plan Participants**

98.     Based upon information and belief and documents available to the public, as early as the Summer of 2000, defendants had specific knowledge that the Company was: (i) experiencing a material decline in its business due to the slowdown in the telecommunications market; (ii) actively manipulated the timing of its revenues to meet forecasts; (iii) concealing the Company's rising inventories; and (iv) concealing cost-cutting measures and planned employee layoffs.

### a. Defendants' Knowledge of the Rapid Slowdown in Customer Orders by the Summer of 2000

99.    By the middle of calendar year 2000, ADC's competitive local-exchange carriers (CLECs) segment, approximately 20% of its business, as well as some of the Company's other large customers, had drastically reduced their ADC orders.  Despite this knowledge, the Individual and Director Defendants falsely represented to the public that ADC was not being adversely affected by the slowdown in the telecom industry, and that there was no indication of declining demand for the Company's products.

100.    Unbeknownst to Plan participants, throughout the Class Period, certain Individual and Director Defendants were consistently warned by numerous employees that ADC's forecasts were not attainable because of the declining demand for ADC's products.  Certain Individual and Director Defendants, nevertheless, neither adjusted their forecasts to correspond to this declining demand, nor adequately advised Plan participants that their previous sales and earnings growth forecasts and guidance were no longer achievable.

101.    For example, as certain Individual and Director Defendants were well aware, by the end of the Summer 2000, ADC had already been notified by AT&T, one of its largest accounts, that it was cutting spending and would reduce orders by 40% to 60%.  In addition, by this time certain Individual and Director Defendants were also aware that Sprint and MCI had also cut their spending for ADC products by 40% to 45%.  Furthermore, upon information and belief, defendant Switz was personally advised about these adverse developments.  In addition, certain Individual and Director Defendants also conducted bi-weekly and monthly meetings with all senior staff, where actual sales and deteriorating market conditions were discussed.  At these meetings, the sales management team specifically detailed the impaired condition of their ac-

counts.

###### b.   ADC Improperly Manipulated the Timing of Its Revenues to Meet Forecasts

102.    Based upon information and belief and documentation available to the public, to conceal the decline in ADC's business, certain Individual and Director Defendants also caused and/or allowed ADC to manipulate the timing utilized by the Company when reporting revenues and earnings.  By prematurely booking orders that were not final as revenues (i.e. "channel-stuffing"), certain Individual and Director Defendants were able to inflate revenues and earnings during the Class Period.  As certain Individual and Director Defendants were well aware, the pre-mature recognition of revenues in contravention of "Generally Accepted Accounting Princi-ples" ("GAAP") and the Company's own internal policies only served to hide and postpone the inevitable disclosures that they would be forced to ultimately make regarding the slowdown in demand for Company products and services.  As the defendants were well aware, however, the premature recognition of revenues during earlier periods virtually guaranteed that ADC had no ability to achieve the Individual and Director Defendants' baseless projections for later periods.

103.    In addition, certain Individual and Director Defendants had to have been aware of the channel-stuffing practices because they resulted in an abnormally large number of product returns, as customers returned orders that had been prematurely shipped to them.  To conceal the number and extent of such returns, certain Individual and Director Defendants contracted with trucking companies to store ADC products off-site ahead of scheduled shipping dates to better facilitate and obscure defendants' channel-stuffing scheme.  After loading these trailers (which were destined for extended stays in trucking companies' lots) with ADC products, certain Indi-

vidual and Director Defendants would then account for these products as having been shipped to a customer.  These Individual and Director Defendants then immediately booked the corresponding revenue in violation of the Company's revenue recognition policies and in violation of GAAP.

### c.  ADC's Dramatically Rising Inventory Levels

104.    Certain Individual and Director Defendants also concealed from Plan participants the Company's growing inventory levels during the Class Period that resulted from the slow-down in demand for ADC's products.  Based upon information and belief, as well as documentation available to the public, some of the Company's distribution centers were so packed with excess inventory that the Company had to resort to using an uncompleted new facility as storage space for excess product inventory.

### d.  ADC's Concealed Cost-Cutting Measures and Planned Lay-Offs

105.    Knowing that the Company could not generate cash revenues through actual sales, the Individual and Director Defendants also secretly engaged in cost cutting and planned dramatic employee lay-offs.   During the Fourth Fiscal quarter of 2000, although ADC had already decided to lay-off a number of employees, certain Individual and Director Defendants deliberately chose not to disclose this fact, knowing that investors would view this disclosure as a sign of Company weakness.

106.    In addition to undisclosed employee layoffs, certain Individual and Director Defendants also secretly instituted a series of cost-cutting measures, which included the elimination of employee training and a restriction on employee travel.

107.    Similarly, by December 2000, certain Individual and Director Defendants had

also scrapped plans for the construction of a new parts assembly plant in Juarez, Mexico.  At the same time certain Individual and Director Defendants aborted plans for this new facility in order to conserve cash, Tom Milbrandt, ADC's Vice President of  Manufacturing, publicly stated that the Company's plans for building more plants in Mexico were proceeding.

      e.      **The Individual and Director Defendants' Motive for Making Materially False and Misleading Statements**

108.     The Individual and Director Defendants were motivated to conceal the true financial and operational condition of ADC because these defendants used the Company's artificially inflated stock throughout the Class Period as currency to acquire other companies.  The Individual and Director Defendants then used the revenue growth acquired through these acquisitions to create the illusion that overall revenue growth at ADC remained robust and that demand remained strong for ADC's products and services.  Thus, at all relevant times, certain Individual and Director Defendants endeavored to artificially inflate the price of ADC's stock.  Meanwhile, these defendants were well aware that the disclosure of the true operational and financial condition of ADC would, and ultimately did, cause the price of ADC stock to plummet.

109.     For example, in September 2000, soon after the inception of the Class Period, the Individual and Director Defendants used a huge amount of artificially inflated ADC stock to acquire Broadband Access Systems, Inc. – a deal valued at over $2.25 billion.   Later, in February 2001, certain Individual and Director Defendants also used more of the Company's artificially inflated stock to purchase CommTech, in a stock-deal valued at $185.5 million.  In connection with the CommTech acquisition, ADC issued 13.25 million common shares valued at $14 per share for all outstanding equity interests in CommTech.

      2.      **Defendants' Failed to Act Prudently**

110.    At the very least, an adequate investigation by defendants would have revealed to a reasonable fiduciary that investment by the Plan in Company stock, under the circumstances alleged herein, was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect Plan participants against unnecessary losses, and would have made a different investment decision.

111.    Because defendants knew or should have known that ADC was not a prudent investment option for the Plan, or was not a prudent investment to the extent of the Plan's investment in the stock, they had an obligation to protect the Plan and its participants from unreasonable and entirely foreseeable losses incurred as a result of the Plan's concentrated investment in ADC stock.

112.    Defendants had available to them several different options for satisfying this duty, including making appropriate public disclosures as necessary; divesting the Plan of ADC stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as Plan fiduciaries to the extent that, as a result of their employment by ADC, they could not loyally serve Plan participants in connection with the Plan's acquisition and holding of Company stock. The Plan Document cited above specifically and/or impliedly allows for any of these actions.

**C.    Defendants Regularly Communicated with Plan Participants Concerning Purchases of ADC Stock, One of the Plan's Largest Assets, Yet Failed to Disclose the Imprudence of Investment in ADC Stock.**

113.    Upon information and belief, ADC regularly communicated with employees, including Plan participants, about ADC's performance, future financial and business prospects, and ADC stock, the largest asset in the Plan.  During the Class Period, the Company fostered a posi-

tive attitude toward the corporation as a Plan investment, and/or allowed Plan participants to fol-

low their natural bias towards investment in the stock of their employer, by not disclosing nega-

tive material information concerning investment in ADC stock. As such, Plan participants could

not appreciate the true risks presented by investments in ADC stock and therefore could not

make informed decisions regarding investments in the Plan.

114.     Plan participants were encouraged to rely on ADC's openness and to trust ADC

to inform them of information they needed to know. ADC boasted in its SPD, "The company is

proud of its tradition of open lines of communication with its employees." 1999 SPD, ADC-ER

000220.

**D.     Defendants Suffered from Conflicts of Interest**

115.     ADC's Proxy Statements filed with the SEC during the Class Period make clear

that a significant percentage of Executive Officer and Non-Employee Director compensation is

in the form of stock grants or stock option grants.

116.     Because their compensation was significantly tied to the price of ADC stock, de-

fendants had a strong incentive to keep the Plan's assets heavily invested in ADC stock on a

regular, ongoing basis. Elimination of Company stock as a Plan investment option would have

reduced the overall market demand for ADC stock and sent a negative signal to Wall Street ana-

lysts. Both results would have adversely affected the price of ADC stock, resulting in lower

compensation for the defendants.

117.     Some defendants may have had no choice in tying their compensation to ADC

stock (because compensation decisions were out of their hands), but defendants did have the

choice whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a

large extent in ADC stock, or whether to properly and timely inform participants of material negative information concerning the above-described Company problems.

118.     These conflicts of interest put the defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, in whose interests the defendants were obligated to loyally serve with an "eye single."  Instead of fulfilling their duties as fiduciaries, defendants Cadogan, Boyle, Johnson, Roehrick, and Rosso used their positions as Company insiders to sell nearly a million shares of ADC stock, reaping collective proceeds of more than $44 million.

119.     The above stock sales were unusual in timing and amount, and were all made with knowledge that ADC would not be able to meet the revenue and earnings predictions that the Company was disseminating to Plan participants.

## CLAIMS FOR RELIEF

120.     At all relevant times, defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

 (1)[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

    (A)    for the exclusive purpose of

        (i)     providing benefits to participants and their beneficiaries; and

        (ii)    defraying reasonable expenses of administering the plan;

    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C)     by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D)     in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

121.     ERISA also imposes strict co-fiduciary duties on plan fiduciaries.  ERISA § 405, 29 U.S.C. § 1105, states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a  fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(a)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(b)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(c)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## <u>COUNT I</u>

**Failure to Prudently and Loyally Manage Plan Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404)**

122.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

123.     At all relevant times, as alleged above, the defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

124.     As alleged above, the defendants were all responsible, in different ways and to

differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company stock.

125.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Defendants were responsible for ensuring that all investments in ADC stock in the Plan were prudent, and are liable for losses incurred as a result of such investments being imprudent.

126.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

127.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period these defendants knew or should have known that ADC stock was not a suitable and appropriate investment for the Plan as described herein.  Nonetheless, during the Class Period, these fiduciaries continued to offer the ADC stock as an investment option for the Plan and to direct and approve the investment of ADC stock, instead of cash or other investments.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in ADC

stock.

128.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

129.    Defendants also breached their co-fiduciary obligations by, among other failures: (1) knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage Plan assets in the exercise of their discretion with respect to the offering of Company stock as an investment option in the Plan, and maintaining previous Company matching contributions in ADC stock, despite knowing that such failure was a breach; (2) enabling the other defendant-fiduciaries to fail to prudently manage Plan assets in the exercise of their fiduciary discretion with respect to Plan investments; and (3) by having knowledge of such ongoing failures to prudently manage the Plan assets, yet not making any effort to remedy such breaches.

130.    Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

131.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

132.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Monitor the Retirement Committee and Individual Defendants
and Provide Them With Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by ADC and the Director Defendants**)

133.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this
Complaint as if fully set forth herein.

134.     At all relevant times, as alleged above, ADC and the Director Defendants were
fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

135.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of
ADC and the Director Defendants included the responsibility to monitor other fiduciaries.

136.     The duty to monitor entails both giving information to and reviewing the actions
of the monitored fiduciaries (the individual defendants).  In this case, that meant that the moni-
toring fiduciaries, ADC and the Director Defendants, had the duty to:

> (1)     Ensure that the Retirement Committee and Individual Defendants pos-
> sessed the needed credentials and experience, or use qualified advisors
> and service providers to fulfill their duties.  They must be knowledgeable
> about the operations of the Plan, the goals of the Plans, and the behavior
> of Plan participants;
>
> (2)     Ensure that the Retirement Committee and Individual Defendants had
> ready access to such outside, impartial advisors, counsel, and experts
> when needed;
>
> (3)     Ensure that the Retirement Committee and Individual Defendants were
> provided with adequate financial resources to do their job;
>
> (4)     Ensure that the Retirement Committee and Individual Defendants had ade-
> quate information to do their job of overseeing the Plan investments;
>
> (5)     Ensure that the Retirement Committee and Individual Defendants main-

tained adequate records of the information on which they based their deci-
sions and analysis with respect to Plan investment options; and

(6)    Ensure that the Retirement Committee and Individual Defendants reported
regularly to the Company, and the Company and the Director Defendants
were then required to review, understand, and approve the conduct of the
hands-on fiduciaries.

137.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries
are performing their fiduciary obligations, including those with respect to the investment of plan
assets, and must take prompt and effective action to protect the plan and participants when they
are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with com-
plete and accurate information in their possession that they know or reasonably should know that
the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

138.    ADC and the Director Defendants breached their fiduciary monitoring duties by,
among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge
about the Company's business problems alleged above, which made Company stock an impru-
dent retirement investment, and (b) failing to ensure that the monitored fiduciaries understood
the huge risk inherent in the significant investments by rank and file employees in ADC stock.
ADC and the Director Defendants knew or should have known that the fiduciaries they were re-
sponsible for monitoring were imprudently allowing the Plan to continue offering the ADC stock
as a Plan investment, and continuing to invest in ADC stock when it no longer was prudent to do
so, yet failed to take action to protect the participants from the consequences of these fiduciaries'
failures.

139.    In addition, as a result of its inappropriate practices and implicit knowledge
thereof, ADC and the Director Defendants, in connection with their monitoring and oversight
duties, were required to disclose to the Individual Defendants accurate information about the fi-

nancial condition and practices of ADC that they knew, or should have known, that these defen-

dants needed to make sufficiently informed decisions.  By remaining silent and continuing to

conceal such information from the other fiduciaries, these defendants breached their monitoring

duties under the Plan and ERISA.

140.    ADC and the Director Defendants are liable as co-fiduciaries because: (1) they

knowingly participated in the fiduciary breaches by the their fellow defendant-fiduciaries in the

activities addressed in this Count; (2) they enabled the breaches by these defendants; and (3) by

having knowledge of these breaches but not making any effort to remedy them.

141.    Defendants in this Count were unjustly enriched by the fiduciary breaches

described in this Count.

142.    As a direct and proximate result of the breaches of fiduciary duties alleged herein,

the Plan, and indirectly plaintiffs and the Plan's other participants and beneficiaries, lost a sig-

nificant portion of their retirement investment.

143.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C.

§ 1109(a), defendants in this Count are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Provide Complete and Accurate Information
### to Plan Participants and Beneficiaries

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA)

144.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

145.    At all relevant times, as alleged above, defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).

146.    At all relevant times, the scope of the fiduciary responsibility of the defendants

included Plan communications and material disclosures.

147.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options such that participants can make informed decisions with regard to investment options available under the Plan.  This duty applies to all Plan investment options, including investment in ADC stock.

148.    Because investments in the Plan were not diversified (i.e. the defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in ADC stock), such investments carried an inherently high degree of risk.  This inherent risk made the defendants' duty to provide complete and accurate information particularly important with respect to ADC stock.

149.    The defendants breached their duty to inform participants by failing to provide complete and accurate information regarding ADC stock, ADC's business prospects and improprieties, misrepresentations and material hidden transactions, and the consequent artificial inflation of the value of ADC stock and, generally, by conveying inaccurate information regarding the soundness of ADC stock and the prudence of investing retirement contributions in ADC equity. These failures were particularly devastating to the Plan and the participants because a heavy percentage of the Plan's assets was invested in ADC stock during the Class Period; thus, losses in this investment had an enormous impact on the value of participants' retirement assets.

150.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding ADC stock, despite knowing of their

breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

151.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of the defendants in this Count constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in ADC stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in ADC stock during the Class Period.  Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the defendants in this Count.

152.    The Plan suffered a loss, and plaintiffs and the other Class members suffered losses, by the above-described conduct of the defendants in this Count during the Class Period because that conduct fundamentally deceived plaintiffs and the other Class members about the prudence of making and maintaining investments in ADC stock, and that, in making and maintaining investments in ADC stock, plaintiffs and the other Class members relied to their detriment upon the materially deceptive and misleading statements, acts and omissions of the defendants in this Count.

153.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

154.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiffs and the Plan's other participants and beneficiaries, lost a sig-

nificant portion of their retirement investment.

155.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29

U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plan caused by

their breaches of fiduciary duties alleged in this Count.

**COUNT IV**

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of**
**ERISA §§ 404 and 405 of ERISA by**
**Director Defendants and Certain Individual Defendants)**

156.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Consolidated Complaint as if fully set forth herein.

157.    At all relevant times, as alleged above, the Director Defendants and certain

Individual Defendants were all fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A).

158.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a

duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the in-

terest of the participants and beneficiaries and for the exclusive purpose of providing benefits to

participants and its beneficiaries.

159.    The Director Defendants and certain Individual Defendants breached their duty to

avoid conflicts of interest and to promptly resolve them when they occurred by continuing to al-

low Company stock as a Plan investment during the Class Period, by failing to engage independ-

ent fiduciaries and/or advisors who could make independent judgments concerning the Plan's

investment in Company stock and the information provided to participants and beneficiaries con-

cerning it, and generally failing to take whatever steps were necessary to ensure that the Plan fi-

duciaries did not suffer from a conflict of interest, including notifying the Department of Labor about the information which made employer stock an unsuitable investment for the Plan.

160.    Upon information and belief, the Director Defendants and certain Individual Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in the ADC stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made ADC stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plan's investment in Company Stock.

161.    An even greater affront to Plan participants was the fact that at least five of the Director Defendants not only withheld material investment-related information from them, but also profited in excess of $45,000,000 on this non-public knowledge by partially liquidating their personal holdings of ADC stock during the Class Period.

162.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

163.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in ths Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**SECTION 404(c) DEFENSE INAPPLICABLE**

164.    The Plan suffered a loss, and the plaintiffs and the other Class members suffered losses, because substantial Plan assets were invested in ADC stock during the Class Period in violation of the defendants' fiduciary duties.

165.    In most cases, participants had no control at all over the ADC stock previously contributed to the Plan as ADC's matching contributions.  Even as to the participant contributions, the defendants were responsible for the prudence of investments provided under the Plan during the Class Period unless participants in the Plan themselves exercised effective and informed control over the assets in the Plan in their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

166.    Defendants failed to comply with these provisions; instead of taking the necessary steps to ensure effective participant control by disclosure of complete and accurate material information, the defendants did exactly the opposite.  As a consequence, participants in the Plan did not have informed control over the Plan's assets that were invested in ADC stock, and the defendants remained entirely responsible for ensuring that such investments were and remained prudent.

167.    The defendants' liability to plaintiffs for relief stemming from imprudent Plan investments in ADC stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of defendants.

**CAUSATION**

168.    The Plan suffered hundreds of millions of dollars in losses because substantial assets of the Plan were allowed by defendants to be imprudently invested in ADC stock during the Class Period, in breach of defendants' fiduciary duties.  This loss was reflected in the diminished account balances of the Plan's participants.

169.    Defendants are responsible for losses caused by Plan participants' direction of investments in ADC stock because defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants concealed material, non-public facts from participants, and provided misleading, inaccurate, and incomplete information to them regarding the true health and ongoing profitability of the Company, and therefore its soundness as an investment vehicle.  As a consequence, participants did not exercise independent control over their investments in Company stock, and defendants remain liable under ERISA for losses caused by such investment.

170.    Defendants are also responsible for all losses caused by the maintenance of past Plan Company matching contributions in ADC stock during the Class Period, as defendants effectively controlled the investment of these assets, and the investment was imprudent.

171.    Had the defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Company stock, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plan from Company stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

172.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring

a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires

"any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries .

. . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other

equitable or remedial relief as the court may deem appropriate . . . ."

173.    With respect to calculation of the losses to a plan, breaches of fiduciary duty re-

sult

in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in

the plan would not have made or maintained their investments in the challenged investment and,

where alternative investments were available, that the investments made or maintained in the

challenged investment would have instead been made in the most profitable alternative invest-

ment available.  In this way, the remedy restores the values of the plan's assets to what they

would have been if the plan had been properly administered.

174.    Plaintiffs and the Class are therefore entitled to relief from the defendants in the

form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan re-

sulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial

based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as

provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) rea-

sonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the

common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these

amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief as follows:

A.     That the Court certify this action as a class action under Rule 23(b)(1), 23(b)(2) and 23(b)(3) with respect to the Class to the extent necessary to effect the purposes of this suit;

B.     That the Court enter Judgment providing the following relief to Plaintiffs, and the Class:

(i)     Joint and several liability against defendants, requiring them to make the Plan whole for the losses incurred as a result of their violations of ERISA, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a);

(ii)     Injunctive relief enjoining defendants from continuing to violate their fiduciary duties under ERISA and the Plan documents, pursuant to ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3);

(iii)     Other injunctive and equitable relief as appropriate to remedy the breaches alleged above, pursuant to ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3);

(iv)     Reasonable attorneys' fees and costs incurred by Plaintiffs and the Class, pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

(v)     Interest on all Judgment amounts as provided by law; and

(vi)     Such other legal or equitable relief as may be just and proper.

Dated:  January 25, 2005

**HEAD, SEIFERT & VANDER WEIDE**


By: s/Vernon J. Vander Weide

Vernon J. Vander Weide (No. 112173)
Thomas V. Seifert (No. 98863)
333 South Seventh Street, Suite 1140
Minneapolis, MN 55402-2422
Telephone: (612) 339-1601
Fax: (612) 339-3372

**Liaison Counsel for Plaintiff**s

**SCHIFFRIN & BARROWAY, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Edward W. Chang
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
Telephone: (610) 667-7706
Fax: (610) 667-7056

**EMERSON POYNTER LLP**
Scott E. Poynter
2228 Cottondale Ln., Suite 100
Little Rock, AR 72202
Telephone: (501) 907-2555
Facsimile: (501) 907-2556

**Co-Lead Counsel for Plaintiffs**

**SCOTT + SCOTT, LLC**
David R. Scott
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-3818
Facsimile: (860) 537-4432

**THE SPENCE LAW FIRM**
Russell Spence
300 Lumber Exchange Building
10 South Fifth Street
Minneapolis, MN 55402

**SLEVIN & HART, P.C.**
Thomas J. Hart
1625 Massachusetts Ave., N.W.
Suite 450
Washington, D.C.  20036

**Attorneys for Plaintiffs**